## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Schwan's Company and Schwan's Shared Services, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> Rongxuan Cai and Conagra Brands, Inc., <br><br> Defendants. | Case No. 0:20-cv-2157 (JRT/HB) <br><br><br> **ORDER ON MOTION TO COMPEL** <br><br> **(FILED UNDER SEAL)** |

This matter is before the Court on Plaintiffs' Schwan's Company and Schwan's Shared Services, LLC ("Schwan's") Motion to Determine the Sufficiency of Defendant Rongxuan Cai's Answers and Objections to Plaintiffs' Requests for Admission and to Compel Interrogatory Answers and Documents from Defendant Rongxuan Cai [ECF No. 100]. This Order addresses the portion of Schwan's motion pertaining to Requests for Production Nos. 2, 3, and 4, and files and evidence of deleted files found on Cai's devices by Schwan's forensic expert. (*See* Pls.' Mem. at 25–42 [ECF No. 102].)[1] This Order also addresses Schwan's request for fees and costs associated with Interrogatories Nos. 6 and 8 and Request for Production No. 12, previously addressed by the Court's January 20, 2022, Order [ECF No. 161]. The Court previously ruled on all other portions of the motion. (*Id.*; Nov. 4, 2021, Minutes [ECF No. 123].) For the reasons set forth below, the

---

[1] For additional clarity, the relief sought by Schwan's on these portions of the motion is reflected in Schwan's Proposed Order ¶¶ 4, 6–9 [ECF No. 110].

Court grants in part and denies in part these remaining portions of the motion.

## I.      Background

### A.      Schwan Serves Requests for Production on Cai in January 2021 and Cai Produces Some Documents, Including a Document Schwan's Alleges He Altered

The claims and background of this case are described in the Memorandum

Opinion and Order Denying [Defendant Conagra's] Motion to Dismiss [ECF No. 126]

and will not be repeated here.  Specific to this Order, Schwan's served its First Set of

Requests for Production on Cai on January 29, 2021.  (Scobie Decl. ¶ 11 [ECF No. 105];

Scobie Ex. 5 [ECF No. 105-5].)  Schwan's Requests Nos. 2–4 sought:

> **REQUEST NO. 2:**
> All documents currently in your possession, custody, or control, or that have been in your possession, custody, or control at any time between December 18, 2017 and today, that were created on or downloaded from a Schwan's computer or server, regardless of when the document was created or downloaded.
>
> **REQUEST NO. 3:**
> All documents currently in your possession, custody, or control, or that have been in your possession, custody, or control at any time between December 18, 2017 and today, concerning the technologies identified in ¶¶ 24, 30, 39-40 of Schwan's Complaint.
>
> **REQUEST NO. 4:**
> All documents currently in your possession, custody, or control, or that have been in your possession, custody, or control at any time between December 18, 2017 and today, concerning any projects or product developments you worked on while employed by Schwan's.

(Scobie Ex. 5 at 2–3.)

Cai responded on March 2, 2021.  (Scobie Decl. ¶ 12; Scobie Ex. 6 [ECF No. 105-6].)  He produced documents on March 4 and 18, 2021.  (Scobie Ex. 12 [ECF No. 105-10].)  Schwan's counsel states that in response to these requests, Cai produced only 156 documents comprising 2,516 pages.  (Scobie Decl. ¶ 20; Tr. Vol. II at 48. [ECF No. 150].)

Among the documents Cai produced was a PDF document Bates numbered Cai_000145, part of a collection of documents produced together beginning at Cai_000141, that appeared to memorialize the results of work done to explore various types of yeast that could be used in steamed bread.  (Scobie Decl. ¶ 17; Scobie Ex. 11 [ECF No. 104-2].)  The document contained a table that identified a number of types of yeast and other ingredients along with various weights and percentages.  (*Id.*)  The table in the document Cai produced bore the date 6/10/2017 (a Saturday) at the top (*id.*), which was notable because Cai alleges in this case that the inventive work underlying his disputed U.S. Patent Application No. 15/855,489, entitled Method of Making Frozen Dough and Products Made Using the Method, and U.S. Patent Application No. 15/855,640, entitled Microwaveable Frozen Breads and Method of Making the Same, was done at home, on his own time, and not at Schwan's.  (Cai's Mem. at 7–10 [ECF No. 112]; Tr. Vol. II at 46–47.)

But Schwan's found on its own servers a document that contained a table that was remarkably similar not only in content but in overall layout and appearance.  (Scobie Decl. ¶ 16; Scobie Ex. 10 [ECF No. 104-1].)  It identified, with only one exception, the same listed ingredients with identical weights and percentages, only that table had Cai's

3

name and the date 6/09/2017 at the top, and contained an additional column at the far left that identified the ingredient numbers assigned by Schwan's internal ingredient management software. (*Compare* Scobie Ex. 10 at 2 *with* Scobie Ex. 11; Pl's Mem. at 29–31.) The Schwan's document also contained a reference at the top left to the internal number of a Schwan's Pan Bread formula while the same line in Cai's document referred to a public Pan Bread method. (*Compare* Scobie Ex. 10 at 2 *with* Scobie Ex. 11; Pl's Mem. at 29–31.)

The "Procedure" sections of the two documents are also very similar, but the procedure described in the document Cai produced referred to home baking equipment rather than the commercial equipment available at Schwan's. (*Compare* Scobie Ex. 10 at 2 *with* Scobie Ex. 11; Pl's Mem. at 29–31.)

Suspecting that Cai had the Schwan's document in its original form and that he had altered it before producing it in order to support his position on when and where the inventive work was done for his patent applications, Schwan's demanded on March 19, 2021, that Cai produce the document, along with several other documents from his production, in native form, with all associated metadata. (Scobie Ex. 12.) Cai eventually did so on April 6, 2021, and the metadata reflected the document had been "last modified" on March 19, 2021. (Scobie Decl. ¶ 19.) Schwan contends other native files later produced by Cai also had "last modified" dates in the metadata that suggested they had been modified after the requests for production were served, but Schwan's does not cite specific examples of altered content. (*Id.*) Cai vehemently denies that he altered or tampered with any documents before producing them to Schwan's. (Tr. Vol. II at 46–47.)

**B.    Schwan's and Cai Enter Into a Contingent Settlement Agreement in April 2021 Pursuant to Which Cai Turns Over a Number of Digital Storage Devices For Forensic Analysis**

Following Cai's initial written responses and production in connection with the document requests, he and Schwan's entered into settlement negotiations and on April 12, 2021, reached a contingent agreement to resolve the case, the terms of which were reduced to writing.  (Scobie Decl. ¶ 8; Scobie Ex. 15 (Settlement Agreement) [ECF No. 104-4].)  The agreement provided that Cai would turn over two identified laptops and six identified external storage devices, "and any other electronic devices in his possession," to Schwan's digital forensic expert (later identified as Mark Lanterman), for "computer forensic analysis." (Settlement Agreement ¶ 3.1.)  Lanterman and his firm, CFS, would make a "forensic mirror image" of any computer or device found to have, or have had, a Schwan's file on it.  (*Id.* ¶ 3.2.)  The agreement further provided that CFS would "remove any Schwan's files from Mr. Cai's computers or devices before returning them to Mr. Cai," but that before any files were deleted a list would be provided to Schwan's and Cai for review.  (*Id.*)  The term "Schwan's files" was not defined in the agreement, but Schwan's counsel and Lanterman both seem to have understood it as meaning files that contained Schwan's intellectual property. (Scobie Decl. ¶ 8; Lanterman Decl. ¶¶ 10–11 [ECF No. 107].)  The costs of the computer forensic investigation would be paid by Schwan's.  (Settlement Agreement ¶ 3.3.)

But the resolution of the case pursuant to the agreement was not only contingent on Cai turning over his devices, it was also contingent upon Schwan's and Conagra separately reaching a settlement of Schwan's then-unasserted claims against the latter.

(Settlement Agreement ¶ 4.)  "If no agreement is reached with Conagra within 45 days of the Effective Date, then this Agreement, and all of its terms, shall become null and void." (*Id.*)

## C.    Cai Turns Over the Identified Devices and Lanterman Analyzes Them and Identifies Concerns

Cai turned over the computers and devices identified in the Settlement Agreement to CFS on April 29, 2021. (Lanterman Decl. ¶¶ 11, 24, 25.)  After analyzing the devices, CFS gave Schwan's detailed listings of all active and deleted files found on the devices, including the name, file path, timestamp, and hash value, but not file contents.  From the information on those listings, Schwan's identified nearly 69,000 files believed to have originated on Schwan's systems.  After deduplication, CFS identified 39,953 unique files.[2]  (Lanterman Decl. ¶¶ 13–15; Second Lanterman Decl. ¶¶ 3-4 [ECF No. 137].)  CFS then "used the 39,953 unique hash values to identify, locate, and subsequently destroy potential Schwan's intellectual property files across Mr. Cai's devices." (Lanterman Decl. ¶ 15.)

As the foregoing paragraph indicates, the forensic analysis identified not only active files but also deleted files.  CFS was able to recover the metadata of the deleted files, including names, file paths, hash values, time stamps, and other identifying

---

[2] Although there is some ambiguity in the declarations, the Court understands this number represents the total number of unique active *and deleted* files believed to have originated on or been downloaded from Schwan's systems.  If this assumption is incorrect and 39,953 is the number of active files only, then the portions of this Order referring to the handling of the deleted files already in the custody of CFS should be understood to apply to that group of deleted files identified by Schwan's based on the file and/or path names to have originated on or been downloaded from Schwan's systems.

information.  (Second Lanterman Decl. ¶¶ 7–13.)  Furthermore, the analysis revealed evidence that thousands of those files were deleted from one of the laptops and three of the external storage devices after October 2020 (when Schwan's filed its complaint against Cai) and before Cai turned over his devices to Lanterman in April 2021. (Lanterman Decl. ¶¶ 18–22.)

Lanterman states the forensic investigation of Cai's computer also produced evidence suggesting some files believed to have originated from Schwan's system had been backed up to a cloud storage account, even though when asked, Cai had represented to Schwan's counsel that he did not use cloud storage.  (Lanterman Decl. ¶¶ 16–17; Scobie Ex. 13 [ECF No. 105-11].)  Finally, the investigation yielded evidence that between February and April 2021, twelve external storage devices, not previously identified by Cai or provided to Lanterman, had been connected to Cai's laptop at one time or another, including one connected the day before the laptop was turned over to Lanterman.  (Lanterman Decl. ¶¶ 23–25.)

### D.    The Contingent Settlement Agreement Falls Through

Meanwhile, despite an extended period of negotiation, Schwan's and Conagra were not able to reach an agreement to resolve any claims Schwan's might have against Conagra.  (First Amended Complaint [ECF No. 62]; Scobie Ex. 4 at 2 [ECF No. 105-4].) As a result, the settlement agreement between Schwan's and Cai was not finalized, Cai remained a defendant, and Schwan's proceeded with its claims against Conagra in this case.  (Scobie Ex. 4 at 2.)  Therefore, as of no later than May 27, 2021, all of the terms of

the settlement agreement became "null and void."  (Settlement Agreement ¶ 4; Scobie Ex. 4 at 2.)

### E.    The Motion to Compel Responses to Requests Nos. 2–4

Schwan's raised with Cai a number of concerns about his discovery responses, including, *inter alia,* that, based on Lanterman's analysis, he had failed to respond fully to Requests Nos. 2, 3, and 4. (Scobie Ex. 4 at 1–2.)  After unsuccessful efforts to meet and confer, Schwan's brought this motion.

In the hearing on this motion, the Court ordered Schwan's to produce a supplemental declaration from Lanterman and a declaration from a Schwan's representative to clarify the details of Schwan's investigation of Cai's electronic storage devices and the evidence they had to support their allegations against Cai.  (December 7, 2021, Minutes [ECF No. 129].)  Schwan's filed those declarations and Cai responded with his own.  (Second Lanterman Decl. [ECF No. 137], Surprenant Decl. [ECF No. 138], Dec. 27, 2021, Cai Decl. [ECF No. 139].)  The Court took the matter under advisement.  (Jan. 21, 2022, Text Order [ECF No. 162].)  In a separate order, the Court ordered Cai to supplement his interrogatory responses.  (*See* Jan. 20, 2022, Order [ECF No. 161].)

Not long thereafter, Cai, who had been proceeding *pro se*, retained counsel, so the Court ordered the parties to file a joint update letter on "the status of any supplementation and further meet-and-confers bearing on the portions of Schwan's motion on which the Court had not yet issued an order" as well as "what issues from Schwan's motion remain unresolved and whether there are ongoing efforts to address them or whether the parties

are at impasse and awaiting an order." (Feb. 18, 2022, Text Order [ECF No. 170].) The

parties filed that letter on February 25, 2022. (Feb. 25, 2022, Ltr. [ECF No. 171].) On

the portions of the motion at issue here, the parties reported that Cai withdrew his

objections, supplemented his responses to Schwan's Requests Nos. 2, 3, and 4, and

stated, "he has no responsive documents that have not already been produced." (*Id.* at 2–

3.) Cai's modified responses are identical for the three requests:

> **RESPONSE:**
> Cai states that he has produced or will produce non-privileged
> documents in his possession, custody, or control that are
> responsive to this Request and relevant to the claims and
> defenses in this case and that can be located after a reasonable
> search.

> **SUPPLEMENTAL RESPONSE:**
> Cai has made a diligent search of his files and electronic
> devices and all documents responsive to this request have been
> previously provided. In particular, Cai disagrees that with the
> conclusions of Mark Lanterman that he has devices or files
> from Schwan's that he has not disclosed.

(Scobie Ex. 6 at 4–7; Feb. 25, 2022, Ltr.)

Cai also disclosed four additional flash drives received as promotional marketing

items that he states he did not use in connection with the litigation or his employment, but

which he would produce if ordered by the Court. (Feb. 25, 2022 Ltr. at 3.) Finally, Cai

stated, "Plaintiff's expert has already conducted a review of Cai's devices and has created

images of those devices. To the extent that Plaintiff believes any of those devices contain

Plaintiff's property, it should investigate that at its own expense," appearing to agree that

the files in the device images should be turned over to Schwan's. (*Id.* at 3.)

Schwan's contends Cai's supplemental responses do not resolve the concerns raised or relief requested in their motion. (*Id.*)

## II.    Standard of Review

Federal Rule of Civil Procedure 26(b)(1) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." If a party believes that an opposing party has failed to respond to discovery, or has served insufficient responses, it may, "[o]n notice to other parties and all affected persons, . . . move for an order compelling disclosure or discovery." Fed. R. Civ. P. 37(a)(1). A court may compel responses if, *inter alia,* a party fails to produce documents requested under Rule 34. *Id.* (a)(3)(B)(iii)–(iv). "For purposes of this subdivision (a), an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." *Id.* (a)(4).

## III.    Discussion

### A.    Requests for Production Nos. 2–4 and the Documents on Cai's Devices

Schwan's argues based on Lanterman's analysis that when Cai produced documents in response to Requests Nos. 2–4, he produced only a small number of the many thousands of responsive documents he actually had on his electronic storage devices, and that he deleted thousands of other potentially responsive documents before he delivered the devices to Lanterman for analysis, withheld other devices from Lanterman, and represented that he had never used cloud storage for his documents when Lanterman's analysis appeared to demonstrate that he had. Furthermore, Schwan's

argues, Cai altered some documents before he produced them, in such a way as to make them appear more favorable to him than they actually were. (Pls.' Mem. at 28.)

Schwan's asks the Court to order Cai to produce any responsive documents still in his possession, including any copies or backups he may have of the files he deleted, as well as the additional external storage devices and the access credentials to the cloud storage account Lanterman identified, and that he do so without altering or destroying any of the files or documents. (*Id.* at 37–42.) Schwan's also asks that the Court authorize Lanterman to turn over to Schwan's all the active and deleted files that Schwan's identified, based on the path and/or file names, as having originated on Schwan's system, subject to Cai's review for private personal files that are not relevant to the litigation and files he claims reflect privileged communications between him and his own counsel. Schwan's also asks the Court to order that Lanterman may attempt to recover any deleted files so that Schwan's can review them to determine which are responsive to its requests, and to impose on Cai the costs of recovering the deleted files. (*Id.* at 39–42.)

### 1.    Active Files Located On Cai's Devices

Citing the thousands of active files on Cai's devices that were identified as most likely having originated on or been downloaded from Schwan's systems, Schwan's argues Cai's original responses and production to Requests Nos. 2–4 clearly were not complete. That said, Schwan's counsel acknowledges that insofar as those files were deleted from Cai's devices before they were returned to him, the only copies of those documents are now in the hands of Schwan's expert, and Cai is not able to produce those

11

documents himself unless he has copies of them stored elsewhere. (Pls' Mem. at 38–39;

Tr. Vol. II at 14.) Schwan's therefore asks the Court to authorize its expert to turn those

files over to Schwan's, once Cai has had an opportunity to review the list of files to

identify any that are reasonably likely to contain irrelevant personal information or

privileged communications between Cai and his own attorney. As indicated by his

responses to the Court during several hearings, Cai appears to agree:

> THE COURT: Okay. So you're saying that it's fine with you if they search all those images to look for documents that are responsive to their requests and that that's a part of your production?
>
> MR. CAI: That's fine with me, yeah.
>
> THE COURT: Okay.
>
> MR. CAI: Yeah, so I have given them everything, and I don't have anything else.

(Tr. Vol. I at 67–68.)

> THE COURT: Let me ask this. I mean, their – a part of their motion is to -- is that I authorize Mr. Lanterman, their expert, to provide them with the files that had Schwan's path names that were on your devices. We'll set aside the deleted -- the ones that they argue were deleted, but just the ones that are still there. Do you have any objection to having Mr. Lanterman make available to Schwan's all of the documents that were on your devices that have Schwan's system path names?
>
> MR. CAI: When I turn this to Schwan's to --whatever they designated to, I turn this to Schwan's. I want to pass my stuff to Schwan's, and that's the last things I pass to them. So I actually turn all my computer, all my devices to Schwan's. And so that's where -- so to answer your question, yes, I have no objections to that except they breach into my personal files, for example, my personal folders and my personal e-mail accounts to get all my information and that I protest in. I raise it now.

(Tr. Vol. II at 34–35.)

> MR. CAI: I do agree to turn this over if it's theirs, so that --
> yeah. And that provide -- I mean, I give it, everything, if theirs
> – it's theirs. But this request of Schwan's is conditioned on the
> portion they have put forward saying that means that after my
> review, so they have said something like that. So it's
> conditioned after a review by Cai to make sure there's no
> personal information that's sent over to them, and they don't
> need that. But, more importantly, this information is personal
> and belongs to me, and so I have to ensure that none of these
> portions comes together with what I intended to turn it to
> Schwan's, give back to them, so that's a condition on the part
> of Schwan's. . . .
>
> THE COURT:  . . . [A]re you saying that if you get a list of all
> of these documents that Mr. Lanterman has ready to turn over
> to Schwan's, are you saying that you would be able to identify
> on that list whether there are personal documents there?
>
> MR. CAI: At least I can look at it and try to identify, yes, that's
> -- yeah.
>
> THE COURT: All right.
>
> MR. CAI: And that's what they say, they are conditioned on
> that. That's in their request.

(April 8, 2022, Case Management Tr. at 13–14 [ECF No. 209].)

In addition, Cai's counsel (during the period he was represented) stated in the February 25, 2022, joint update letter that "Plaintiff's expert has already conducted a review of Cai's devices and has created images of those devices. To the extent that Plaintiff believes any of those devices contain Plaintiff's property, it should investigate that at its own expense," again appearing to agree that the documents should be turned over to Schwan's.  (Feb. 25, 2022, Ltr at 3.)

13

The Court finds that Schwan's and its expert have sufficiently shown that the active files on the list of 39,953 files are almost certainly responsive at least to Request No. 2. Therefore, in light of the supplemental response to that request withdrawing relevancy objections and committing to the production of all responsive documents, the Court agrees with Schwan's that Lanterman should now be authorized to turn those documents over to Schwan's, subject to Cai's review for privileged or purely personal, irrelevant information.

### 2.    Files Allegedly Deleted By Cai From His Devices

As discussed, Lanterman's analysis revealed evidence that "tens of thousands of files had been deleted from Mr. Cai's devices after the complaint was filed" in October 2020. (Lanterman Decl. ¶ 18.) This, in and of itself, is not necessarily indicative of wrongdoing on Cai's part, as the statement is not specific to files that were believed to have originated on or been downloaded from Schwan's systems or files that were relevant to the case. Furthermore, the Court cannot assume that Cai, as a layperson, knew he should not delete relevant files after being served with Schwan's' complaint.

Significantly more troubling, however, is that Lanterman found evidence that 13,000 documents were deleted from Cai's external hard drive on or after March 17, 2021, after Cai made his initial responses to Schwan's' First Set of Requests for Production, and that half of those deletions occurred in April 2021, shortly before the devices were turned over to CFS. (*Id.* ¶ 19.) Lanterman found a similar pattern of deletions in the analysis of Cai's laptop. Furthermore, Lanterman's analysis found evidence that those more recently deleted files and/or file names contained the words

"Schwan," "dough," "yeast," "steamed bread," "pizza crust," and other words that could suggest the content of the files pertains to Schwan's' products or processes and/or projects on which Cai worked while employed there.[3]  (*Id.* ¶¶ 19–22.)  In post-hearing declarations, Lanterman and a Schwan's scientist, Patrick Surprenant, identified additional words found in the file paths or file names for the deleted files and explained their significance to Schwan's internal projects and processes, including projects and processes in which Cai would have been involved or about which he would have had knowledge while he was employed there. (*See generally* Second Lanterman Decl.; Surprenant Decl.)  These included specific references to pieces of analytical equipment in the laboratory where Cai worked, the names of Schwan's plant locations for which testing would have been conducted, the network drive and the name of an internal SharePoint site where Schwan's stores confidential R&D information, and recognizable Schwan's project names.  (Surprenant Decl. ¶¶ 2–4.)  Indeed, the list of deleted files generated by CFS included a number of file names that were identical to files stored on the confidential R&D SharePoint site and which files included information on product formulas, project summaries, experimental results, and other information that resulted

---

[3] Lanterman comments that the inclusion of words like "dough," "yeast," "steamed bread" and "pizza crust" indicates that the files "ostensibly represent[] Schwan's intellectual property." (Lanterman Decl. ¶¶19, 21, 22.)  But it is not for Lanterman to opine on the metes and bounds of Schwan's intellectual property, and the suggestion that any file referring to "dough," "yeast," "steamed bread" or "pizza crust," even if it originated on a Schwan's server, "represents Schwan's intellectual property" is speculative and beyond the scope of Lanterman's expertise.

from Schwan's R&D efforts. (*Id.* ¶ 6.) A number of other file names could be correlated to Schwan's confidential product and ingredient specifications. (*Id.* ¶¶ 7–11.)

Thus, there seems to be no question that at one time, Cai had on several of his devices thousands of files that came from Schwan's servers and that contained Schwan's R&D information as well as product and ingredient specifications, and that at some point those files were deleted. On the other hand, neither Lanterman's second declaration nor Surprenant's declaration identify *when* any of the files they describe more specifically therein were deleted. Even if the Court assumes (although Lanterman does not say so) that the deleted files discussed in his second declaration are the same files he describes in his first declaration as having been deleted sometime after the complaint was filed in October 2020, the Court does not have sufficient information to determine to what extent the Schwan's files described in Surprenant's declaration were deleted after they had been requested in discovery or even on the eve of turning them over to CFS for analysis. The same goes for the deleted emails Lanterman describes in his second declaration. (Second Lanterman Decl. ¶ 16.)

For his part, Cai stated that he may have deleted some personal files shortly before turning his devices over to Schwan's expert, and suggested (although it was difficult to tell for sure) that in the course of doing so he might accidentally have deleted some responsive files, although he insists he had no intention of doing so. (Tr. Vol. II at 39.)

Thus, there are two questions for the Court to address. First, should Schwan's expert be permitted to attempt to restore and turn over to Schwan's for review the deleted

files from the list of 39,953?  Second, who should foot the bill for the cost of restoring them?

The first question is relatively easy.  For the same reason the Court is satisfied with Schwan's' showing that the active files on the list are likely responsive at least to Request No. 2, so also does it appear that the deleted files on that list are also likely responsive at least to that request.  Therefore, the Court agrees Schwan's should be permitted to have its expert attempt to restore those files, and that the restored files should be produced to Schwan's, subject to an opportunity for Cai to identify any files that are purely personal or that are privileged. For the avoidance of doubt, this Order does not authorize the attempted restoration or review of any deleted files not identified on the list of 39,953 files likely to have been created on or downloaded from Schwan's system.

The second question is more difficult.  Schwan's counsel reported during the hearing that the estimated cost to restore only the files believed to be from Schwan's system ranged from $15,000 to $25,000.  (Tr. Vol. II at 15–16.)  The Court is not persuaded at this point that assigning to Cai the cost of restoring the files is proportional. First, the parties' resources are obviously vastly different, and Cai is an individual who is unrepresented because he cannot afford to retain counsel.  (Cai Decl. Supp. Mot. Withdraw Att'y [ECF No. 179].)  Second, as already noted, it is not clear when the files were deleted vis á vis when Cai should reasonably have understood his obligation to preserve relevant evidence.  Third, the Court is not convinced at this point that the incremental value of restoring the deleted documents is proportional to the cost of doing so.  Among other things, although the fact that the deleted files were created or

downloaded from a Schwan's server makes them responsive, it does not necessarily make them relevant. Furthermore, it is uncertain to what extent the information contained in the deleted files is cumulative of the information in the active files, or to what extent information in the deleted files will prove significant to Schwan's claims that Cai not only took Schwan's intellectual property but used or attempted to use it. Finally, as a practical matter, Schwan's and its expert are more likely to be incentivized to be strategic and efficient in their approach to assessing the deleted files if they are not operating on a blank check to be written by another party. The Court will therefore deny at this time Schwan's demand that Cai pay for the costs of recovering the deleted files, without prejudice to raising the request again on a more robust future showing that such cost-shifting is warranted and/or for other sanctions under Federal Rule of Civil Procedure 37(e).

As for the specifics of the process of Cai's review and Schwan's receipt of the active and deleted files that are the subject of the foregoing discussion, Schwan's is directed to instruct Lanterman to provide to Cai a list of the 39,953 active and deleted files whose file paths indicate they were created on or downloaded from Schwan's server or system. Cai shall review that listing and within two weeks of receiving it shall identify to Lanterman and Schwan's any documents he has reason to believe are likely to contain privileged communications between Cai and his personal counsel (as opposed to privileged communications between Cai and counsel representing Schwan's), or a document that contains only private personal information that does not pertain in any way to the claims or defenses in this case, such as personal identifying information of Cai's

family members, private medical information, or personal financial information. To be clear, however, Cai may not object to the production of any of these files simply on the ground that the file represents his own "personal" inventive work. The opportunity to object to the production of purely personal files is intended to cover private personal information that is *entirely unrelated* to Cai's defenses or Schwan's claims and allegations, regardless of whether Cai agrees Schwan's claims are true.

If Cai identifies *active* files that he has a good faith basis to believe may be subject to withholding on the limited grounds described above, Schwan's shall work with CFS to arrange to securely provide Cai with temporary, read-only access to those files for the purpose of reviewing them to determine whether they actually contain such personal or privileged information.

If after review Cai concludes there are files subject to withholding on the limited grounds identified above, he must provide a list of those files to Schwan's counsel within one week after the review is completed, identifying each such file that he contends should be withheld, along with an explanation of the basis for his claim. The explanation must provide sufficient information for Schwan's to evaluate the basis for the claim without disclosing the actual privileged or private personal information. If the parties disagree after an exchange of written communications explaining their position, they must request a conference with the Court to determine the best means of resolving the dispute, likely through an *in camera* review of the contested documents or a sampling thereof.

If Cai identifies *deleted* files that he has a good faith basis to believe may be subject to withholding on the limited grounds described above, his further review of such

files must be naturally deferred until and unless the files are restored, but will otherwise follow the process above.

In addition, Lanterman may immediately upon the completion of each phase of Cai's review release to Schwan's all files (from the list of 39,953) that were not identified for possible withholding by Cai.  If in the course of reviewing those files Schwan's finds any that it believes in good faith contain private personal data not relevant to the case, or that reflect privileged communications between Cai and his counsel, it shall segregate those documents, shall not review them further, and shall notify Cai about them.

### 3.    Allegedly Altered Documents

Schwan's points to a document Cai produced that contained a dough recipe he submitted in support of Patent Application No. 15/855,489.  Schwan's alleges the original document actually originated at Schwan's, and that Cai altered it to make it appear that he developed the recipe using his own tools and on his own time rather than as part of his employment with Schwan's.  (Pl's Mem. at 28–32.)

Cai originally produced the document on or before March 18, 2021, as a PDF Bates numbered Cai_000145, part of a collection of documents produced together beginning with Cai_000141.  (Scobie Decl. ¶ 17; Scobie Exs. 11, 12 [ECF Nos. 104-2, 105-10].)  On March 19, after noting the similarities with the document from its own files, Schwan's requested the metadata, the native file, and the storage location on Cai's

devices for this and several other documents.  (Scobie Ex. 12.)  Cai produced the native files and associated metadata on April 6, 2021.

As already discussed, a side-by-side comparison of the dough recipe document Cai produced and the document Schwan's found in its own system shows them to be remarkably similar, including the layout, the identity, order, and precise measurements of the ingredients used in five different formulations, the procedure, and the fact that Cai's document bears a date just one day after the date on the Schwan's document reflecting Cai's work at Schwan's.  (Pl's Mem. at 28–32; Scobie Exs. 10, 11.)  Schwan's argues this shows that Cai had a copy of the Schwan's document in his possession, but altered it before producing it in response to discovery in order to create "evidence" that the work underlying his patent application had been done at home on standard kitchen equipment based on a publicly available recipe, rather than appropriated from work he did at Schwan's and which therefore belonged to Schwan's.

Schwan's further argues that the metadata for the document also supports the conclusion that it was altered before Cai produced it in discovery.  Counsel states in her declaration that the metadata indicates the document was "last modified" on March 19, 2021, and that the metadata of other native files Cai produced in response to Schwan's March 19 request also showed last-modified dates well after Schwan's first requests for production; she provided screenshots of lists of Bates numbered Cai files showing six files with last-modified dates on March 19, 2021, and later. (Scobie Decl. ¶ 19.)

The Court agrees the similarities between the file Schwan's found on its own system and the document produced by Cai are at the least highly suggestive that Cai used

the Schwan's file and the information therein to create his own document.  That may well prove significant in establishing Schwan's claims that Cai misappropriated its intellectual property in connection with his patent application.  But Schwan's has not persuaded the Court of the point it tries to make here—that *after the Complaint was filed and/or the request for production was served*, Cai altered a document that existed in his files before he produced it to Schwan's.  For that temporal element, Schwan's relies entirely on the fact that the "last modified" date for the document was March 19, 2021.  But Cai had already produced the document to Schwan's in PDF form before March 19.  The Court can think of no reason why he would modify the document *again* after he had produced it in PDF and before he produced the native file.  Furthermore, Schwan's mentions no difference in content between the native file and the PDF they received.

Furthermore, the Court thinks Schwan's is reading too much into the "last modified" date—or at least, Schwan's has not offered evidence that the "last modified" date means that the file was substantively modified on that date.  Based on the evidence presented to the Court, the March 19, 2022 "last modified" date may reflect nothing more than the most recent date Cai opened and saved the document,[4] which he may well have

---

[4] *See, e.g.,* An Attorney's Brief Guide to Dating (Computer File Dating That Is), https://digitalmountain.com/newsletter/an-attorneys-brief-guide-to-dating-computer-file-dating-that-is-by-troy-larson/ (last visited June 5, 2022) ("A file's last modified date refers to the date and time that a file is last written to.  Typically, a file is modified or written to when a user opens and then saves a file, regardless of whether any data is changed or added to the file.").  The Court does not cite this resource as dispositive on the subject, but only by way of pointing out that in the absence of expert evidence from Schwan's regarding the significance of the "last modified" date and why the Court should conclude from it that Cai altered the document before producing it to Schwan's, the Court cannot and will not draw that conclusion on its own.

done with no ulterior motives upon receiving Schwan's request that he produce the native file.  In short, Schwan's has offered no evidence to suggest that the alleged transformation of the original Schwan's document to the document Cai produced on or before March 18, 2021, occurred after Schwan's filed its complaint or served its discovery requests.  Perhaps Schwan's forensic expert's analysis may eventually reveal more detail about the document's history, but for now, the Court cannot conclude Cai did anything other than produce a PDF, and later the native version, of a document in the form in which it had been in his possession since before the lawsuit was brought.   The same is true of the other documents bearing a March 19 or later "last modified" date.

### 4.    Flash Drives and Cloud Storage Account

Lanterman's analysis indicated that twelve additional external storage devices beyond those identified in the contingent settlement agreement had been connected to Cai's laptop, including one on the eve of providing the laptop to CFS.  The settlement agreement called for Cai to turn over all "electronic devices in his possession."  Cai only acknowledges four previously undisclosed flash drives; although he insists that none of them was used for employment or for this litigation, he states he would be willing to produce them for analysis if ordered to do so.  Cai did not indicate whether the four flash drives were part of Lanterman's list of twelve devices.

The terms of the settlement agreement have expired and therefore do not provide a continuing basis to insist that Cai turn over every storage device in his possession. Furthermore, just because an external storage device was connected to a computer does not mean that documents were transferred from the computer to the storage device, let

alone that *relevant*, *nonduplicative* documents were transferred from the computer to the storage device.

Nevertheless, Schwan's has raised sufficient reason to be concerned about Cai's deletion of relevant and discoverable documents that the Court finds it appropriate to order Cai to turn over the four flash drives he acknowledges are in his possession.  In addition, because the Court finds credible Lanterman's conclusion that twelve devices that Cai had not already produced were connected to Cai's laptop at some time between February and April 2021, the Court also orders Cai to conduct a thorough search for all other USB storage devices in his possession and to produce for Lanterman's analysis any such device that bears the same serial number as one of the devices identified in Paragraph 24 of Lanterman's declaration.  Cai must turn over all such devices within 7 days of this Order, and must submit a declaration under oath to Schwan's counsel that he has conducted a thorough search and has found none of the other devices listed in Lanterman's declaration.

Regarding the cloud storage account, as the Court understands it, Cai argues that he does not have credentials for the Microsoft OneDrive application because it opens automatically when he starts his computer and he does not have to enter credentials for it; he also denies intentionally storing any documents in the cloud.  (Tr. Vol. II at 36–37.) But Lanterman states the investigation yielded evidence that many files saved on Cai's computer were also backed up to a OneDrive account.  (Lanterman Decl. ¶ 16.; Pls' Mem. at 35.)  Accepting the expert's conclusion while giving Cai the benefit of the doubt, it is possible that Cai's OneDrive account automatically launches when he starts

his computer and automatically backs up the files on his computer without him realizing. To the extent the application launches and logs in automatically, Cai would not have to enter any credentials, consistent with his arguments. The Court is also aware that OneDrive uses a Microsoft account to login, the same credentials required to login to Microsoft Office applications and other Microsoft products. *See* Microsoft, *One Drive Personal Cloud Storage*, https://www.microsoft.com/en-us/microsoft-365/onedrive/online-cloud-storage (last visited April 5, 2022). Automatic file backup could also occur as a background process on the computer such that Cai is not aware it is happening.

The question is whether, knowing this to be the case, Cai should be required to provide his access credentials to Schwan's expert for the purpose of searching his Microsoft OneDrive cloud storage account for responsive documents. Ordinarily, the responsibility to search such locations for responsive documents would be that of the responding party, and the Court well understands Cai's reticence about having others trusted with his credentials so they can conduct the search for him, but Cai has unfortunately provided Schwan's and this Court with plenty of reason to doubt the thoroughness of his search; whether it is the result of his lack of understanding of what is responsive or because of his lack of understanding of the various sources where responsive documents might be stored is beside the point. Furthermore, and of even greater concern, Cai has provided Schwan's and the Court with plenty of reason to doubt that documents have been preserved as they should have been. Since Cai states he does not have resources to pay for an attorney of his own, and therefore does not have the

25

resources to pay for an electronic discovery expert on his own, and the Court is not confident entrusting the search to him alone, the Court orders Cai to provide to Lanterman, or another designated analyst at CFS, the access credentials to his Microsoft OneDrive cloud storage account within seven days of this Order.  If Cai does not know his login credentials, Lanterman or another CFS analyst shall coordinate a call with Cai to help him identify the credentials.  Lanterman and CFS will protect the information as highly confidential, will share it within their organization only on a need-to-know basis, and will not share it with Schwan's or Schwan's counsel.  Promptly after accessing the cloud account for the purposes required herein, CFS is ordered to destroy any record it may have of Cai's credentials.

Cai has previously been ordered not to alter, modify, or destroy any information that may be relevant to this case.  (Tr. Vol. II at 51.)  He is specifically ordered not to alter, remove, or delete any files on flash drives or the OneDrive account, whether or not he believes they are relevant, before providing them to CFS.

CFS and Schwan's shall follow the same process described above in imaging and analyzing active and deleted files on the storage devices and on the OneDrive account and identifying those that appear to have originated on or been downloaded from Schwan's servers.  Cai must be provided a list of all files alleged by Schwan's to have originated on or been downloaded from Schwan's system so that he can identify documents that may be subject to withholding on the limited grounds described above. In addition, however, Cai must be given the opportunity to challenge whether the files did

originate on or were downloaded from Schwan's system (since that issue has not been vetted through the current motion practice).[5]

Finally, the Court emphasizes that because the terms of the contingent settlement agreement are no longer in effect, *CFS is not authorized to delete any files from the devices or from the account, regardless of whether the files are believed to have come from Schwan's systems or to contain Schwan's intellectual property, absent Cai's permission to do so or an order from this Court upon separate motion.*

## B.    Schwan's Request for Attorneys' Fees and Costs

Rule 37(a)(5)(A) provides that if a motion to compel is granted, the Court "must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion . . . to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees," unless "the opposing party's nondisclosure, response, or objection was substantially justified" or "other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(a)(5)(A), (A)(ii), (A)(iii).  The Court has already found that Cai's position in response to Plaintiff's motion pertaining to Interrogatories Nos. 6 and 8 and Request for Production No. 12 was substantially unjustified.  (Jan. 20,

---

[5] If Cai and Schwan's disagree as to whether any of the documents identified from the additional storage devices or from the cloud account came from Schwan's systems and cannot resolve that dispute through the exchange of written communications, Schwan's will have to make a separate motion seeking production of those documents, as this Order permitting production to Schwan's of the already identified active and deleted files is premised only on Schwan's demonstration that *those* files came from its systems and were therefore responsive at least to Request No. 2.  Cai would be well-advised, however, not to waste Schwan's or the Court's time on such objections if the identification is based on comparable information concerning the analysis of the file and/or path names.

2022, Order.)  Cai's objections and responses to those discovery requests were not well taken, and Schwan's requests for him to revise and supplement his responses were clearly meritorious before they brought this motion.[6]

In addition, the Court finds Cai's position with regard to some part—but not all—of the disputes addressed by this Order to be not substantially justified.  On the one hand, it was not unreasonable for Cai to believe that his having turned over the devices for analysis in April 2021 was sufficient to remedy any gaps in his prior production, (*see* Tr. Vol. II at 34), and it is not clear Schwan's counsel ever actually tried without motion practice to move ahead with a process for Cai to review the list of active and deleted files and seek his go-ahead to have CFS disclose to Schwan's any files to which Cai did not object.  Similarly, it does not appear that Cai has ever objected to Schwan's attempts to restore the deleted files, but only to Schwan's request to bear that cost, and the Court has declined to grant Schwan's motion to compel him to do so.  Furthermore, it is not clear what more Cai could have done once he had turned over his devices, as CFS deleted the potentially responsive files from Cai's devices before returning them.

On the other hand, Schwan's has demonstrated that Cai at least negligently failed to provide to CFS for analysis or to conduct his own search for files that may exist on storage devices and a cloud storage account that likely contain responsive documents. Furthermore, the appropriateness of allowing Schwan's, through its expert, to search

---

[6] The Court did not make a similar finding, however, with regard to Cai's position on Plaintiff's motion with regard to Interrogatories Nos. 7 and 9 or with regard to the requests for admissions. (*Id.*)

those additional sources has been underscored by evidence that Cai deleted responsive documents after the litigation was filed and, indeed, after discovery was requested.

Therefore, the Court finds that Schwan's is entitled to an award of twenty percent of the attorneys' fees related to bringing Plaintiffs' Motion to Determine the Sufficiency of Defendant Rongxuan Cai's Answers and Objections to Plaintiffs' Requests for Admission and to Compel Interrogatory Answers and Documents from Defendant Rongxuan Cai, unless Cai can demonstrate that such an award would be unjust because of his financial circumstances.  To be clear, the Court will not require Cai to reimburse the costs of any part of Lanterman's analysis or the preparation of his declarations.

Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiffs' Motion to Determine the Sufficiency of Defendant Rongxuan Cai's Answers and Objections to Plaintiffs' Requests for Admission and to Compel Interrogatory Answers and Documents from Defendant Rongxuan Cai [ECF No. 100] is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.     For the 39,953 active and deleted files whose file paths indicate they were created on or downloaded from Schwan's server or system:

   a.   Schwan's will instruct CFS to provide to Cai the listing of those files;

   b.   Within two weeks of receiving the list, Cai must review it and identify to CFS and Schwan's any documents he has reason to believe are likely to (a) contain privileged communications between Cai and his personal counsel (as opposed to privileged communications between Cai and counsel representing Schwan's), or (b) contain only private personal information that does not pertain in any way to the claims or defenses in this case.  For the avoidance of doubt, Cai may not object to the

production of any of these files simply on the ground that the file represents his own "personal" inventive work;

c. If Cai identifies *active* files that he has a good faith basis to believe may be subject to withholding on the limited grounds described above, Schwan's shall work with CFS to arrange to securely provide Cai with temporary, read-only access to those files for the purpose of reviewing them to determine whether they actually contain such personal or privileged information;

d. Cai must provide a list of files he believes should be withheld to Schwan's counsel within one week after being given access to them, identifying each file that he contends should be withheld, along with a sufficient explanation for Schwan's to evaluate the basis for his claim that the document should be withheld without disclosing the actual privileged or private personal information contained in the document;

e. If Cai identifies *deleted* files that he has a good faith basis to believe may be subject to withholding on the limited grounds described above, his further review of such files will follow the same process, except that it will be deferred until after any such files are restored;

f. CFS may immediately upon the completion of each phase of Cai's review release to Schwan's all files (from the list of 39,953) that were not identified for possible withholding by Cai. If in the course of reviewing those files Schwan's finds any that it believes in good faith contain private personal data not relevant to the case, or that reflect privileged communications between Cai and his counsel, it shall segregate those documents, shall not review them further, and shall notify Cai about them;

g. The parties must attempt to resolve any disagreements through an exchange of written communications explaining their positions. If they fail, they must request a conference with the Court to determine the best means of resolving the dispute.

2. For the twelve external storage devices identified by Lanterman and the four devices confirmed by Cai:

a. Within seven days of this order, Cai must:
   i. Produce for CFS the four flash drives Cai acknowledges are in his possession;

30

      ii.    Conduct a thorough search for all USB storage devices in his possession and produce for CFS's analysis any such device that bears the same serial number as one of the devices identified in Paragraph 24 of Lanterman's declaration [ECF No. 107]; and

     iii.    Produce to Schwan's counsel a declaration under oath stating that he has conducted a thorough search for devices covered by this Order and has produced the devices he could find, and has found none of the other devices listed in Lanterman's declaration;

b. Cai is specifically ordered not to alter, remove, or delete any files on the flash drives;

c. CFS is authorized to image the devices and to follow the same process described in Lanterman's declarations to work with Schwan's to identify any files on the devices that appear to have originated on or been downloaded from Schwan's servers;

d. CFS shall not delete any files from the devices before returning them to Cai absent Cai's permission to do so or an order from this Court upon separate motion.

3.    For Cai's OneDrive cloud storage account:

a. Within seven days of this order, Cai must to provide to CFS the access credentials to his Microsoft OneDrive cloud storage account. If Cai does not know his login credentials, Lanterman or another CFS analyst shall coordinate a call with Cai to help him identify the credentials;

b. Cai is specifically ordered not to alter, remove, or delete any files in the OneDrive account;

c. CFS must protect Cai's credentials as highly confidential, must share that information within their organization only on a need-to-know basis, and must not share it with Schwan's or Schwan's counsel or with any other person or organization;

d. Promptly after accessing the cloud account for the purposes required herein, CFS is ordered to destroy any record it may have of Cai's credentials;

e. CFS is authorized to image or otherwise capture in a forensically sound manner the files on the OneDrive account and to follow the same process described in Lanterman's declarations to work with Schwan's to

identify any files on the devices that appear to have originated on or been downloaded from Schwan's servers;

    f.   CFS shall not delete any files from OneDrive account absent Cai's permission to do so or an order from this Court upon separate motion;

4.    If Schwan's wishes to obtain copies of any of the files from the additional storage devices or from Cai's OneDrive account that Schwan's alleges to have originated on or been downloaded from its systems or servers, the process for review by Cai and production to Schwan's will be as set forth in Paragraph 1 above; provided, however, that Cai must also be given the opportunity to challenge whether the files did originate on or were downloaded from Schwan's system.[7]

5.    Determination of Attorney's Fees.

    a.   No later than **June 27, 2022**, Schwan's must file a declaration and supporting documentation setting forth the reasonable attorneys' fees incurred in preparing and presenting Plaintiffs' Motion to Determine the Sufficiency of Defendant Rongxuan Cai's Answers and Objections to Plaintiffs' Requests for Admission and to Compel Interrogatory Answers and Documents from Defendant Rongxuan Cai [ECF No. 100].[8]

    b.   No later than two weeks after Schwan's files the above declaration, Cai may file a response setting forth any objections or challenges to the reasonableness of the fees and/or his ability to pay twenty percent of them.

    c.   No later than one week after Cai's response, Schwan's may file a brief reply.

    d.   The Court's order on a fee award will be made on the papers without a hearing unless after review the Court concludes that a hearing would be helpful.

6.    This Order is temporarily filed under seal. **Within 21 days of the date of this Order,** Plaintiff and Cai shall file a joint letter identifying with

---

[7] See also Footnote 5 above.

[8] The Court will perform the necessary calculation to arrive at twenty percent of the total fees, after evaluating the reasonableness of the fees and making any reductions it finds appropriate.

specificity the portions of this Order, if any, that they believe should be redacted from any publicly-filed version of this Order, failing which the Order will be unsealed in its entirety.

Dated: June 15, 2022

/s Hildy Bowbeer
HILDY BOWBEER
United States Magistrate Judge