# EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 21-cv-2088 (JMB/LIB)

CARL ANDERSON AND
TAMMY ANDERSON,

               Plaintiffs,

   v.

UNITED STATES OF AMERICA,

               Defendant.


**DEFENDANT'S RESPONSE TO
PLAINTIFFS' SECOND MOTION TO AMEND
SCHEDULING ORDER**

**[_FILED UNDER SEAL_]**

1

**TABLE OF CONTENTS**

I.　　INTRODUCTION ................................................................................. 1

II.　　BACKGROUND .................................................................................. 1

　A. Dr. Daniel Tseng ............................................................................. 1

　B. The Legacy Letter ........................................................................... 2

　C. Efforts by the United States to obtain more information .................... 4

　D. Plaintiffs' response to Dr. Tseng's situation ..................................... 5

III.　　ARGUMENT ..................................................................................... 6

　A. Legal standard ................................................................................. 6

　B. Plaintiffs have shown neither excusable neglect nor good cause ....... 8

　　1. Plaintiffs cannot establish excusable neglect ............................... 8

　　　a. Allowing Plaintiffs to swap experts would seriously
　　　　prejudice the United States ..................................................... 9

　　　　i. Prejudice to ability to defend the case ............................. 10

　　　　ii. Prejudice resulting from prolonging the litigation .......... 13

　　　　iii. The prejudice cannot be fully mitigated .......................... 14

　　　b. The length of the delay weighs against allowing
　　　　Plaintiffs to swap experts ...................................................... 22

　　　c. Plaintiffs have not adequately explained the reason
　　　　for their delay ......................................................................... 23

　　　d. Plaintiffs have not filed their motion in good faith ................. 25

　　2. Plaintiffs have not shown diligence, and thus cannot establish good
　　　cause ......................................................................................... 28

　C. Alternatively, the Court should impose restrictions to reduce the inevitable
　　prejudice to the United States ......................................................... 31

IV.　　CONCLUSION ................................................................................. 33

## I.    INTRODUCTION

Nearly three years into this hard-fought case, Plaintiffs ask the Court to let them replace their key liability expert with a new and better one. They present an incomplete narrative in support of this extraordinary request, falsely suggesting their delay resulted entirely from factors outside their control and glossing over the unfairness and prejudice to the United States that would inevitably result from allowing them to swap experts now. Plaintiffs fail to show either good cause, or that their untimely request is justified by excusable neglect. Accordingly, the motion should be denied.

## II.    BACKGROUND

### A.  Dr. Daniel Tseng

Plaintiffs' sole liability expert to date in this medical malpractice case brought under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346 et al., has been Dr. Daniel Tseng, a general surgeon and foregut specialist. *See* Doc. No. 1 (complaint attaching expert report of Dr. Tseng). His opinion sharply criticizes the performance of the VA surgeon in the case. Liability is hotly contested, and the United States has devoted considerable resources toward countering Dr. Tseng's opinions.

Plaintiffs' case is exceptionally weak on the merits. All along, that weakness has been precisely because of Dr. Tseng. He did not draft his own expert report, which sets forth a medical theory that makes little sense and runs directly counter to both the record and the VA surgeon's sworn testimony. Moreover, not only was Dr. Tseng's principal theory – that the left gastric artery "must necessarily" have been cut on April 25, 2018 – untenable from the start, he then refused to retreat from it in the face of a credible

alternative explanation from the United States's expert surgeon and the treating physician's adamant denial that the theory reflects the reality of what happened.

Accordingly, both Dr. Tseng's rebuttal report and his deposition testimony exacerbated the flaws in Plaintiffs' case. His deposition, in particular, provided the United States with literally dozens of admissions and concessions. Dr. Tseng's demeanor was also poor, as he became defensive and angry with counsel at several points. For these and other reasons, the United States has been preparing to move for the exclusion of Dr. Tseng under *Daubert* and/or for summary judgment based on the incredible and unconvincing nature of his expert opinions.

### B.  The Legacy letter

Meanwhile, Dr. Tseng has been in grave professional trouble. After the United States deposed Dr. Tseng, the undersigned counsel learned that Dr. Tseng had, before the deposition, lost his clinical privileges at Legacy Good Samaritan Medical Center ("Legacy") in Portland, Oregon, one of his principal employers. *See generally* Doc. No. 127 (declaration accompanying pending motion to compel discovery). The United States learned this information in a simple and straightforward way. Plaintiffs in another lawsuit against the United States in the Central District of California, *Castillo v. United States*, Case No. 2:22-cv-04390-KS (C.D. Cal.), had also retained Dr. Tseng as an expert. On March 11, 2024, an Assistant U.S. Attorney assigned to that case informed the undersigned counsel that Dr. Tseng had produced to the United States a November 8, 2023, letter from Legacy relating to professional discipline. *See* Doc. Nos. 127, 128.

The undersigned counsel first received a copy of the Legacy letter on March 12, 2024. *Id.* The letter explains that Legacy's Medical Executive Committee (MEC) had "decided to summarily suspend" Dr. Tseng's clinical privileges "effective immediately," and was further recommending revocation of his privileges based on serious patient-care findings as well as Dr. Tseng's "lengthy history of behavior issues." *Id.* Specifically, Legacy had concluded its "comprehensive" investigation into two cases of "patient demise" as well as another case that was also reviewed by Providence St. Vincent, a different hospital also employing Dr. Tseng. *Id.* Those particular investigations had begun in the Spring of 2023, and Dr. Tseng was sent written notice of them on at least May 18, 2023. *Id.*

The November 2023 Legacy letter also made clear Dr. Tseng has an "extensive history" of "prior and ongoing concerns involving [his] professional practice, both at this hospital and at Providence." *Id.* Ultimately, according to the letter, Legacy's decision to suspend Dr. Tseng's privileges was deemed "warranted and necessary to protect the safety of patients, address quality of care concerns, and ensure the orderly operation of the hospital." *Id.* The Legacy letter also made clear Dr. Tseng had hearing and appeal rights, and additional proceedings were contemplated. *Id.*

During Dr. Tseng's November 20, 2023 deposition, he made no mention of any professional discipline issues or the November 8, 2023 Legacy letter. Doc. No. 127 ¶ 2.[1]

---

[1] The undersigned counsel did not realize until today, August 30, 2024, that Plaintiffs had in fact provided an updated CV following Dr. Tseng's deposition that no longer lists Legacy among the institutions at which he has privileges. The undersigned counsel apologizes for all mistaken prior statements indicating that no updated CV was provided.

**C.  Efforts by the United States to obtain more information**

Having received the Legacy letter, the United States could have waited until trial to spring it on Plaintiffs.  But rather than pursuing "litigation by ambush," the United States instead chose to share the letter with Plaintiffs on April 24, 2024, along with related discovery requests.  Since then, the United States has made extensive efforts to get more information about Dr. Tseng's current status at Legacy, including whether or not he has permanently lost clinical privileges as a result of the investigations and disciplinary proceedings referenced in the letter.  These efforts have included written discovery, subpoenas, correspondence, and discussions with counsel representing Plaintiffs, Dr. Tseng, and Legacy. See Doc. Nos. 127-3, 128, 128-1, 128-2, 128-5, 128-6 (exhibits to pending motion to compel); Doc. 120-7.

To date, the United States's efforts have been unsuccessful.  For their part, Plaintiffs staked out a position disclaiming any obligation to provide information about Dr. Tseng in a May 13, 2024 letter, and in their May 24, 2024 discovery responses.  Doc. Nos. 127-1, 128-3, 128-4, 128-7 (exhibits to pending motion to compel).  And both Dr. Tseng and Legacy invoked a supposedly blanket protection against any discovery under Oregon's peer-review privilege statute, ORS § 41.675.  *See, e.g.*, Doc. 120-8, 120-9.  Dr. Tseng's invocation of the privilege is currently the subject of a motion to compel Rule 45 subpoena response in the District of Oregon (under seal), set for a telephonic hearing on August 30, 2024, the same day this response is being filed.

### D.  Plaintiffs' response to Dr. Tseng's situation

Over the four months since receiving the Legacy letter, Plaintiffs have steadfastly held to the position that they are under no obligation to be aware of developments relating to professional discipline, loss of clinical privileges, and the like with respect to an expert witness whose opinion they rely on to accuse a VA surgeon of committing negligent acts. Plaintiffs repeatedly claimed to be unable to provide any information about Dr. Tseng's situation because they lack "firsthand knowledge" about it.  Doc. No. 127-1.  In response, the United States reminded Plaintiffs of their responsibility under Rule 26 to provide information about their experts' qualifications, including the duty to update such information should it change in material ways.  Doc. No. 128-6.  For example, the United States sent Plaintiffs a letter to this effect on July 12, 2024, *id*., and copied Plaintiffs' counsel on letters to Dr. Tseng and Legacy the next day citing caselaw to the effect that a state-law medical review privilege cannot overcome federal discovery obligations.  *See* August 30, 2024 Declaration of David Fuller ("Fuller Decl."), Ex. C, D.

Plaintiffs emailed the undersigned counsel on July 23, 2024 – more than a week *before* Dr. Tseng's supposedly unexpected withdrawal – suggesting the United States agree to allow them to substitute in a different expert.  Doc. 120-12.   To this day, Plaintiffs have still provided no substantive information about Dr. Tseng's situation at Legacy since the time of his deposition last November.

In the face of all this, Plaintiffs now contend they were caught by surprise when Dr. Tseng informed them in early August (four months after counsel for the United States provided them with a copy of the November 2023 Legacy letter) that he would be

withdrawing from this matter. This strains credulity. Apart from a single one-sentence email from Dr. Tseng's counsel and a cursory summary by Plaintiffs' counsel, no evidence has been provided on any communications between Plaintiffs and Dr. Tseng since the United States provided the Legacy letter in April. Accordingly, much remains unknown about the true circumstances that led to Plaintiffs' current motion. Taking Plaintiffs' version of events at face value, it would appear that Dr. Tseng's reason for withdrawing amounts to a desire to protect his professional reputation, premised on the possibility that the United States will prevail in its efforts to compel discovery related to the Legacy letter.

Be that as it may, Plaintiffs have also reported that Dr. Tseng has not "recanted" his previous opinion and they intend to continue relying on that opinion to prove liability unless and until they are given leave to substitute in a new expert. Fuller Decl. Ex. E.

### III.    ARGUMENT

#### A.  Legal standard

Plaintiffs cite the wrong standard for determining whether to grant their extraordinary request. While they discuss only "good cause," in fact they must also show "excusable neglect." The reason is that Plaintiffs are asking the Court to let them take action – disclose a new and different liability expert – long after the deadline for doing so has passed. Where that is the case, Rule 6(b)(1)(B) applies. Under that rule:

> When an act may or must be done within a specified time, the court may, for good cause, extend the time:
> . . . (B) on motion made *after the time has expired* if the party failed to act *because of excusable neglect.*

Fed. R. Civ. P. 6(b)(1) (emphases added).

"Whether a party's neglect of a deadline is excusable is at bottom an equitable inquiry." *Spirit Lake Tribe v. Jaeger*, 5 F.4th 849, 854 (8th Cir 2021) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)).  Many courts considering whether to allow a party to swap experts past the disclosure deadline have applied this standard.  *See, e.g.*, *Greencity Demo, LLC v. Wood Envir. & Infrastructure Sol'ns, Inc.*, 2022 WL 17553026, *2 (W.D. Ky. Dec. 9, 2022) ("Yet if the time to act has expired, the party must file a motion establishing that it failed to act because of excusable neglect."); *Miesen v Henderson,* 2022 WL 392931, *2 (D. Idaho Feb. 9, 2022) ("Moreover, because Miesen filed this motion after the time had passed to disclose expert witnesses, Rule 6(b)(1) also applies, which adds that not only must there be 'good cause' to modify a scheduling order, but there must also be 'excusable neglect.'"); *Leibel v. NCL (Bahamas) Ltd.*, 185 F.Fupp.3d 1354, 1358 (S.D. Fla. 2016) ("Finally, the Court finds that even if good cause existed for a modification of the scheduling order, the Plaintiff has not demonstrated excusable neglect.").[2]

Moreover, even "good cause" is a far more demanding standard than Plaintiffs suggest.  "The good cause standard is an exacting one, and requires a demonstration that the Scheduling Order cannot reasonably be met despite the diligence of the party seeking the extension." *E.E.O.C. v. Hibbing Taconite Co.*, 266 F.R.D. 260, 265 (D. Minn. 2009)

---

[2]  *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748 (8th Cir. 2006), is not to the contrary. The decision did not consider whether the excusable-neglect standard should apply, and addressed a unique situation involving "re-designation" of a previously-disclosed rebuttal expert as a primary witness. *See id.* at 759-60.

(internal quotations omitted).  *Target Corp. v. LCH Pavement Consultants, LLC*, 960 F.

Supp. 2d 999, 1004 (D. Minn. 2013) (describing good-cause standard as "tough[]").

### B. Plaintiffs have shown neither excusable neglect nor good cause.

In order to obtain the extraordinary relief they seek, Plaintiffs must show both good

cause and that their untimely request resulted from excusable neglect.  Because they have

shown neither, the Court should deny their motion.

### 1. Plaintiffs cannot establish excusable neglect.

Factors considered in determining whether excusable neglect exists are well-settled.

"Relevant considerations include the danger of prejudice to the opposing party, the length

of the delay, the reason for the delay, and whether the movant acted in good faith."  *Spirit*

*Lake Tribe,* 5 F4th at 854.  "Both Rule 6(b) and the case authorities make clear that the

showing needed to extend a pretrial deadline is more onerous the later in the case it is made,

and particularly so if made after a deadline passes."  *Savage v. City of Twin Falls*, 2015

WL 12681319, *7 (D. Idaho Jan. 20, 2015) (quoted by *Miesen*, 2022 WL 392931, at *2).

In determining whether excusable neglect exists, courts consider "all pertinent

circumstances."  *Harris Corp. v. Ruckus Wireless, Inc.*, 2015 WL 3883948, *6 (M.D. Fla.

June 24 2015).

At bottom, excusable neglect is an equitable inquiry, *Spirit Lake Tribe*, 5 F.4th at

854, and here, the equities do not weigh in Plaintiffs' favor.  Accordingly, they cannot

demonstrate that their request to name a replacement expert at this late phase of the case is

the result of excusable neglect.

### a. Allowing Plaintiffs to swap experts would seriously prejudice the United States.

This case has been going on for years. From the start, Plaintiffs' malpractice claims have been founded squarely on the medical opinions of Dr. Tseng. Any new liability expert they might find to replace him would necessarily improve their case. For that and many other reasons, at this point there is simply no way to avoid serious prejudice to the United States if Plaintiffs are allowed to switch experts. *See, e.g., Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759-60 (8th Cir. 2006) (opposing party "would have suffered significant prejudice" if district court had allowed for different expert "two years after the deadline to disclose primary witnesses"; party had "based its litigation strategy on the initial disclosure of primary experts, . . . selected its own expert witnesses and developed motion and trial strategies based on that expert witness evidence"); *Fagen, Inc. v. Exergy Devp't Group of Idaho, LLC*, 2016 WL 2885958, *3 (D. Minn. May 17, 2016) (allowing for new expert "would result in substantial prejudice" because "a modification at this stage would, for all intents and purposes, restart expert discovery, even though the case has languished in discovery for approximately two years").

If Plaintiffs' request is granted, the United States's ability to defend the case will be greatly harmed, and the resulting delay will further prejudice the United States in other ways. While imposing certain restrictions – such as requiring Plaintiffs to submit an affidavit certifying that they did not provide Defendant's expert reports to their new expert prior to that expert providing an opinion – could ameliorate the prejudice somewhat, prejudice cannot be eliminated or avoided.

### i. Prejudice to the ability to defend the case

From day one, the United States's entire liability defense has necessarily entailed responding to Dr. Tseng's opinion. Indeed, the United States "selected its own expert witness[]" and has all along been "develop[ing] motion and trial strategies based on" Dr. Tseng's opinions and testimony in the case. *Marmo*, 457 F.3d at 760; *see also id.* ("To cure the prejudice in allowing Dr. Meggs to testify as a primary witness, the district court would have had to re-progress the case and practically start anew."); *Leibel*, 185 F.Supp.3d at 1358 n.7 (noting defendant "would suffer prejudice" if plaintiff were allowed to swap experts, in part because "both the parties and the Court have an important interest in the reliability of scheduling order deadlines"); *Miesen*, 2022 WL 392931, at *3 ("Additionally, substituting in a new expert would add significant and unjustifiable delay.").

For nearly three years, multiple attorneys and other employees within the U.S. Departments of Justice and Veterans Affairs have devoted untold hours to developing and pursuing the United States's litigation strategy. The United States also engaged its own liability expert to help analyze, understand, and generally defend against Dr. Tseng's attacks on the skills and reputation of an excellent VA surgeon. To date, the United States has paid that expert over $35,000. *See* Fuller Decl. ¶ 2. Additionally, the United States prepared for and took Dr. Tseng's deposition, extracting dozens of statements from him that will be most helpful in defending the case going forward. Plaintiffs try to minimize the effects of switching to a new and different expert, suggesting such prejudice is far outweighed by the prejudice to them from not having a liability expert. But the prejudice to the United States is very real.

Numerous courts considering motions like this one, where much time and effort have already gone into litigating the case, have given great weight to the "significant prejudice" the nonmoving party would inevitably experience. *Marmo*, 457 F.3d at 760; *see also Fagen, Inc. v. Exergy Devp't Group of Idaho, LLC*, 2016 WL 2885958, *3 (D. Minn. May 17, 2016) (denying substitution, in part because "a modification of the scheduling order would result in substantial prejudice" by requiring parties to, "in essence, restart expert discovery"); *Smith v. Reynolds Transport Co*., 2013 WL 247714, *3 (D. S.C. Jan. 23, 2013) (denying substitution where "reopen[ing] discovery at this late date would . . . entail significant prejudice both to Defendants and the administration of justice"); *GreenCity Demo, LLC v. Wood Environment & Infrastructure Soln's, Inc.,* 2022 WL 17553026, *3 (W.D. Ky. Dec. 9, 2022) (denying substitution, and noting even "small delays have significant impacts"); *Fidelity Nat'l Financial, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 308 F.R.D. 649, 655 (S.D. Cal. 2015) (denying motion to substitute where expert had heart attack; "this Court also finds that FNF has demonstrated that it would be significantly prejudiced by NU's designation of a new expert at this late stage in the litigation."); *Doctor's Assocs., Inc. v. QIP Holder LLC*, 2009 WL 5184404, *5 (D. Conn. Dec. 23, 2009) (Doc. No. 120-20) (granting motion, but noting "the practical result of the substitution is to put [the defendant] in a significantly worse position than it would have been otherwise."); *Cardiac Science v. Koninklijke Philiips Electronics*, *N.V.* No. 03-1064 (DWF/FLE), 2006 WL 3836137, *4 (D. Minn. Dec. 22, 2006) (granting motion but addressing "the inevitable prejudice . . . caused by the substitution").

Courts are especially attuned to situations like this one, where allowing a party to swap experts would create a tactical advantage by improving the party's position in the case. *Miesen v. Henderson*, No. 1:10-cv-00404-DCN, 2022 WL 392931, *3 (D. Idaho Feb. 9, 2022) (denying motion to swap experts following exclusion of party's "only case-in-chief expert witness" where party claimed to be "satisfied" with prior expert but court found party was "not satisfied having an excluded expert witness"; circumstances did not justify "resetting the clock so [party] can have another shot at getting a better witness") *Leibel v. NCL (Bahamas) Ltd.*, 185 F.Supp.3d 1354, 1355, 1358 (S.D. Fla. 2016) (denying request to swap out "Plaintiff's only designated medical expert" who "was not a viable medical expert"); *Fidelity Nat'l Financial, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 308 F.R.D. 649, 653 (S.D. Cal. 2015) (denying substitution where expert had heart attack; rejecting party's argument "that it does not seek a better expert, but simply an equal substitute"); *id.* at 655 (noting concern to avoid allowing party "to gain a windfall advantage by substituting a 'new and better expert'"); *U.S. ex rel. Agate Steel, Inc. v. Jaynes Corp.*, 2015 WL 1546717, *2 (D. Nev. April 6, 2015) ("The purpose of allowing substitution of an expert . . . is not an opportunity to designate a better expert."); *Crandall v. Hartford Cas. Ins. Co.*, 2012 WL 6086598, *3 (D. Idaho Dec. 6, 2012) ("Plaintiff's request closely resembles a case of 'buyer's remorse.' Simply put, Plaintiff regrets hiring Mr. Dawson. . . . A party's dissatisfaction with their expert's opinions and/or an expert's lack of regular and timely communication is an unfortunate circumstance, to be sure. However, it cannot serve to re-calibrate the litigation (at the Court's and Defendant's expense)"); *Taylor v. Dean*, 2007 WL 7622152, *1 (M.D. Fla. Jan. 19, 2007) (disallowing

12

substitution where expert "turned out to be an ineffective witness for Plaintiff"); *id.* at *6 (rejecting plaintiff's "attempt to belatedly revamp his case with another and possibly better expert witness").

### ii. Prejudice resulting from prolonging the litigation

Beyond making the lawsuit far harder to defend, allowing a replacement expert will prejudice the United States in other ways. These other forms of prejudice are ongoing, and they increase the longer this lawsuit drags on. For example, in order to adequately defend the case, counsel for the United States (within both DOJ and the VA) must coordinate with numerous VA employees, conducting fact interviews, gathering and analyzing documents and information, preparing for depositions, and much more. This all represents a substantial drain on government resources, and it will continue until the case is finally resolved.

Then there is the VA surgeon accused of violating the standard of care – the key government employee affected by the litigation. Research shows that physicians experience great stress as a result of being named in a malpractice suit. Indeed, one study indicates over 95% of physicians who were sued report the litigation "had a major psychological and/or physical effect on them," and about 25% "report that it was the most stressful occurrence of their lives." *Catastrophic cardiovascular complications from medical malpractice stress syndrome*, Journal of Neurosurgery 130:2081 (June 2019), Fuller Decl. Ex. F. This has been labeled medical malpractice stress syndrome (MMSS), and is seen as "akin to posttraumatic stress disorder." *Id.* Doctors may experience malpractice allegations as "an assault on their integrity and a true existential threat,"

leading to new physical problems as a result of being "overwhelmed with acute and severe mental stress." *Id.*

Another study of surgeons accused in malpractice cases confirmed the experience "can precipitate profound distress," including emotional exhaustion, burnout, and reduced career satisfaction, and is generally an "occupational risk factor that can adversely impact surgeons' personal health." *Personal Consequences of Malpractice Lawsuits on American Surgeons*, Journal of the American College of Surgeons Vol. 213, No. 5 (November 2011), Fuller Decl. Ex. G.

Such ongoing impacts to the experience of a federal-government surgeon constitute another form of prejudice to the United States from prolonging the case as a result of allowing Plaintiffs to substitute in a new expert at this time.

### iii.  The prejudice cannot be fully mitigated.

 Recognizing the inevitable prejudice to the United States from allowing them to switch experts, Plaintiffs promise to "ensur[e] that any replacement expert's opinions are consistent with Dr. Tseng's prior stated opinions and testimony."  Doc. No. 119, at 11.[3]  It is hard to understand how they could make such a pledge under any circumstances – and especially if Plaintiffs truly did only identify a potential replacement expert as of Dr. Tseng's apparent withdrawal decision, the very week they filed their motion.  What expert

---

[3] *See id.* at 2 (Plaintiffs "have undertaken that the replacement expert's opinion would be consistent with Dr. Tseng's opinions so that the scope of the case would be essentially unchanged.").

could so quickly assess the state of the evidence and provide Plaintiffs with an assurance of that sort?

The assurance is also problematic on its face.  Which iteration of Dr. Tseng's many updated opinions in the case will the new expert's opinion be consistent with?  Dr. Tseng has been involved since 2019, and has signed numerous versions of his opinion (including a rebuttal report), before also giving extensive deposition testimony.  None of those have been identical, and some have reflected changes on important issues.  Furthermore, will the new expert opine in a manner fully consistent with Dr. Tseng's deposition – including his unwillingness to back down from a weak liability theory in the face of conflicting testimony from the VA surgeon and a plausible alternative explanation from the United States's expert?  Plaintiffs' promise of consistency raises more questions than it answers, and will no doubt generate new litigation disputes.

Be that as it may, any new liability expert Plaintiffs may proffer would not be Dr. Tseng.  The new expert will bring his or her own professional history, experience, and perspective to bear on the issues in this case.  Plaintiffs acknowledge the United States "will have to adjust its defense somewhat," but attribute such a "minor inconvenience" to the mere need "to deal with a new personality."  Doc. No. 119 at 16.  This completely mischaracterizes the situation.  An expert's *personality* is not what matters – rather, what counts is the expert's analysis, reasoning, and basis for reaching the conclusions at issue. And all this must be understood against the backdrop of the expert's particular skills, credentials, and professional history.

Therefore, even assuming a replacement expert were to reach opinions "consistent with" Dr. Tseng's, the United States would require considerable time, and need to expend substantial resources, in order to adequately understand, analyze, and credibly critique the opinions of the new expert. *See, e.g., Marmo*, 457 F.3d at 760 (in order to fairly allow substitution, "the district court would have had to re-progress the case and practically start anew."); *Miesen*, 2022 WL 392931, at *2 (rejecting motion to replace experts even though moving party proposed that "the substitute expert would be limited to using whichever opinions he or she agrees with which are contained within [the prior expert's] report and by deleting any objectionable content"); *Harrison v. United States*, 2021 WL 1269119, *10 (D. Alaska April 6, 2021) ("Expert discovery as it pertains to the new expert shall be reopened."); *Fagen, Inc. v. Exergy Devp't Group of Idaho, LLC*, 2016 WL 2885958, *3 (D. Minn. May 17, 2016) (if substitution of expert were allowed, the necessary scheduling "modification at this stage would, for all intents and purposes, restart expert discovery, even though the case has languished in discovery for approximately two years").[4]

---

[4] *See also Doctor's Assocs., Inc. v. QIP Holder LLC*, 2009 WL 5184404, *4 (D. Conn. Dec. 23, 2009) (Doc. No. 120-20) ("Therefore, the Plaintiff essentially seeks an enlargement of the discovery period in order to conduct expert discovery anew."); *Taylor v. Dean*, 2007 WL 7622152, *5 (M.D. Fla. Jan. 19, 2007) ("Not only would the Defendants need to depose Mr. Levine, but they would most likely need to either obtain an additional expert or at a minimum have their existing expert prepare another expert report."); *Chrisman v. RMH Franchise Holdings*, No. 5:16-cv-6144-DGK, 2018 WL 401819, *2 (W.D. Mo. Jan. 12, 2018) (allowing substitution of expert who "withdrew because of illness," but amending scheduling order to allow defendant to "designate additional, or alternate, expert witnesses").

That is why even several of the cases Plaintiffs cite impose significant restrictions on a replacement expert beyond the sort of assurance Plaintiffs offer here. For example, in *Cardiac Science v. Koninklijke Philiips Electronics, N.V.* No. 03-1064 (DWF/FLN), 2006 WL 3836137, *3-5 (D. Minn. Dec. 22, 2006), Judge Frank allowed substitution where an expert withdrew in part because of "recent personal tragedies," *id.* at *2, but imposed conditions such as (1) not permitting the new expert to "testify in any manner that is contrary to or inconsistent with" the prior expert; (2) allowing the other party to depose the new expert for up to two days, with the substituting party to pay "travel costs (if any), and the attorney fees incurred preparing for and taking" the deposition; and (3) providing that the prior expert's "deposition testimony may be used for impeachment purposes at trial." *Id.* at *4.[5] And the court in *Chrisman v. RMH Franchise Holdings*, No. 5:16-cv-6144-DGK, 2018 WL 401819, *2 (W.D. Mo. Jan. 12, 2018), where the expert "unexpectedly became seriously ill" and would be "unavailable to testify," took the step many courts allowing substitution take, of allowing the other party to "designate additional, or alternate, expert witnesses." Finally, in *Doctor's Assocs., Inc. v. QIP Holder LLC*, 2009 WL 5184404, *1, *5 (D. Conn. Dec. 23, 2009) (Doc. No. 120-20), the court ordered the new expert's "testimony at trial . . . limited to establishing the veracity and integrity of [the prior expert] and the conclusions reached in [the prior expert's] original expert report." As

---

[5] *See also Morel v. Daimler-Chrysler Corp.*, 259 F.R.D. 17, 22 (D. P.R. 2009) (allowing substitution for deceased expert, but noting other party "will be able to challenge [the new expert's] testimony with the transcript of [the prior expert's] deposition").

shown by these decisions Plaintiffs themselves cite, such restrictions are justified and appropriate in the event that the Court grants Plaintiffs' motion.

To preserve at least a modicum of fairness, other courts have imposed sensible restrictions like: (1) prohibiting the substituting party from "disclos[ing] or discuss[ing]" the other party's "expert reports with [the] new standard-of-care expert until [the substituting party] has served that new expert's report on" the other party, *Harrison v. United States*, 2021 WL 1269119, *10 (D. Alaska April 6, 2021); (2) requiring the substituting party to "pay the costs [the other party] has incurred with regard to" the prior expert, *id.*, and (3) requiring the new expert to simply "adopt the initial and rebuttal expert reports of [the prior expert] in their entirety," such that the new expert's "opinions and theories shall be limited to those expressed in [the prior expert's] reports," *Park v. CAS Enterprises, Inc.*, 2009 WL 4057888, *4 (S.D. Cal. Nov. 19, 2009).[6]  Yet even efforts of this sort could never fully eliminate the prejudice.

Plaintiffs' other attempt to minimize prejudice – offering to "pay for the reasonable costs of the Government having to depose the replacement expert," Doc. No. 119 at 2 – also falls short.  For one thing, the offer is essentially illusory, as the agreed-upon protocol in this case already has been that each side pays for its own experts' time to sit for a deposition.  *See* Fuller Decl. Ex. A (email exchange between counsel reflecting this agreement before expert depositions commenced).  More importantly, though, the offer entirely fails to recognize the tremendous resources the United States has already devoted

---

[6] *See also Fidelity Nat. Financial, Inc.,* 308 F.R.D. at 656 (citing *Park,* and referencing concept of a "'stand-in' live witness" at trial).

to defending the case, which has been squarely based on Dr. Tseng from day one. This has taken many forms.

Consider just two examples – the reports and testimony of Dr. Jeff Friedman, the United States's own liability expert, and the deposition of Dr. Tseng. For his part, Dr. Friedman did an independent review of the thousands of pages of medical records from the VA and the University of Minnesota, before drafting his own report responding to the theories of Dr. Tseng. Dr. Friedman later produced a supplemental report after realizing he had not in fact seen a substantial portion of the U of M records. His report was in direct response to Dr. Tseng's opinions. Plaintiffs later took Dr. Friedman's deposition. For his considerable work on the case to date, the United States has paid $35,250.00 to Dr. Friedman. *See* Fuller Decl. ¶ 2. At the very least, if Plaintiffs are allowed to switch to a different expert now, they should be made to reimburse the United States for this cost. *See, e.g., Harrison,* 2021 WL 1269119, at *10; *Enborg*, 2022 WL 1300569, at *3 (distinguishing *Belmont Corp. v. Shell Oil Co.*, 1998 WL 242686 (N.D. Cal. May 12, 1998), where party "agreed to reimburse defendant for time spent reviewing and responding to the original expert's report"); *Plum v. Neschis*, 2007 WL 5256966, * (S.D. N.Y. Oct. 23, 2007) ("In addition, if Plaintiffs choose to substitute new experts to replace Dr. Plum, they should pay the expert costs and fees incurred by Defendants to date – both in preparing to depose Dr. Plum and in procuring rebuttal expert reports."); *Sithon Maritime Co. v. Holiday Mansion*, 1998 WL 433931, *1 (D. Kan. July 30, 1998) (requiring plaintiff "as a condition of the substitution to reimburse defendant . . . $18,500 as reasonable expense attributable to the review and critique of the report of" the prior expert)

19

Another key question implicating prejudice, in the wake of all this, is whether Plaintiffs' new expert will be allowed to learn about Dr. Friedman's opinions and testimony before drafting the new opinion and testifying in the case. If so, then it would seem Plaintiffs have, by swapping experts toward the end of the discovery period, greatly improved their litigation position by virtue of sheer timing, if nothing else. Have Plaintiffs' counsel already shared Dr. Friedman's opinions and testimony with their newfound expert? If so, that alone should be a basis to prohibit them from working with that expert in the circumstances. *See, e.g., Harrison,* 2021 WL 1269119, at *10 ("Plaintiff shall not disclose or discuss defendant's expert reports with her new standard-of-care expert until she has served that new expert's report on defendant."); *Fidelity Nat. Fin., Inc. v. Nat. Union Fire Ins. Co.*, 308 F.R.D. 649, 654 (noting concern that new expert's opinion may be "shaped by knowledge of the parties' arguments").

As for Dr. Tseng's November 20, 2023 deposition, he made dozens of statements under oath that are helpful to the United States's case. Since that time, in contemplating summary judgment and trial, and in formulating its strategic approach to discovery issues, the United States has relied heavily on many of the answers Dr. Tseng gave at his deposition. For example, Dr. Tseng admitted that he did not draft his own report – it was drafted by lawyers – and even adamantly insisted one of the diagrams *in his report* was "not representative . . . at all" of the anatomical situation in the case, and that his report's diagram was "absolutely not true" – all strongly underscoring that the report was ghostwritten for him. Fuller Decl. Ex. B (deposition excerpts).

Sharing more such examples of testimony helpful to the United States would reveal work product and itself risk further prejudice. But suffice it to say that Dr. Tseng's deposition has affected major litigation inflection points ever since, such as how the United States chose to respond to Plaintiffs' 30(b)(6) deposition notice served a week later on November 28, 2023 – including which topics to oppose and how strongly, how to approach negotiating many of the topics, which witnesses to designate to testify on behalf of the United States, how to work with those witnesses in preparation, and so forth. *See* Doc. Nos. 49-1, 48 (deposition notice and related motion). And again, that is just one example of how Dr. Tseng's deposition testimony has greatly affected the shape of the litigation.

Therefore, one important question for prejudice purposes is whether Plaintiffs will continue to be bound by concessions and other statements made by Dr. Tseng at his deposition that are or may prove adverse to their case. If not, and Plaintiffs are given a clean slate to start afresh with a new expert (albeit limited to offering opinions "consistent with" those of Dr. Tseng), then will the United States be allowed to reconsider and revisit its strategic litigation choices made along the way in reliance on things Dr. Tseng did or did not say at his deposition? These are not easy questions, but the United States respectfully submits that they must be addressed in any true effort to mitigate the unavoidable prejudice from allowing Plaintiffs to swap in a new expert for Dr. Tseng at this late phase of the case. *See, e.g.*, *Doctor's Assocs., Inc.*, 2009 WL 5184404, at *3 (reviewing evidence, and noting specific differences between original expert's report and new expert's report).

**b. The length of the delay weighs against allowing Plaintiffs to swap experts.**

As Plaintiffs admit, Doc. 119 at 3, the deadline they wish to extend – for them to disclose expert reports – passed nearly two years ago, on September 30, 2022. Doc. No. 16. Because that is a very long time, this factor weighs against any finding of excusable neglect.

Of course, had Dr. Tseng withdrawn from the case in May of 2023, when Legacy informed him of a serious investigation and proposed suspension of privileges, the current situation could have been avoided altogether. But even if the delay is measured from the time Plaintiffs say they first learned Dr. Tseng was facing serious professional issues going to the heart of his qualifications and credibility – when the United States sent them the Legacy letter and related discovery on April 24, 2024 – that delay of well over three months would likewise weigh against excusing their neglect. *See, e.g., Leibel*, 185 F.Supp.3d at 1357 ("Plaintiff cannot demonstrate good cause for why she waited from February 8, 2016 to April 11, 2016 to seek substitution when she knew Dr. Wilkerson was not a viable medical expert on February 8th.").

Plaintiffs hope the Court will only measure their delay from Dr. Tseng's apparent decision to withdraw. But that is not the best measure, as Plaintiffs by their own admission knew as of April 24, 2024 that their key liability expert was facing serious investigations and had already lost his privileges at Legacy. By failing to take immediate steps, Plaintiffs chose to gamble that the Legacy letter would not materialize into admissible evidence that could be used to challenge Dr. Tseng's credibility and professional credentials. *See, e.g.,*

*Fagen*, 2016 WL 2885958, at *3 (denying request to substitute experts where party "failed to do anything for almost two weeks (and perhaps more)," "chose to ignore [their expert's] warnings," and thus "fail[ed] to take prompt remedial action"); *Smith*, 2013 WL 247715, at *2 (denying substitution where party "fail[ed] to seek an extension of the relevant deadlines when they *first learned of possible problems* with [expert's] willingness or ability to give expert testimony") (emphasis added); *Crandall*, 2012 WL 6086598, at *2 (finding plaintiff failed to show good cause where he took a "blind, 'wait and see' approach" by not seeking to substitute experts until defendant threatened to move for summary judgment);

Accordingly, this factor does not support a finding of excusable neglect.

### c. Plaintiffs have not adequately explained the reason for their delay.

Whether considering excusable neglect or good cause, the Court's inquiry "revolves around the moving party's reasons for seeking modification." *Miesen*, 2022 WL 392931, at *3 (cleaned up). Plaintiffs suggest the sole reason for their request to switch experts is that Dr. Tseng "recently and unexpectedly announced that he is withdrawing as an expert in the case." Doc. 119 at 1. They explain that his reason for doing so was the threat by the United States to move to compel compliance with its document subpoena relating to the Legacy letter and surrounding circumstances. *Id.* According to Plaintiffs, this is a circumstance totally outside their control.

The Court should not credit this simplistic version of events. The only evidence from Dr. Tseng Plaintiffs have provided is a one-sentence email from his counsel that simply states, "After further discussion with Dr. Tseng, he will be standing by his decision to withdraw as serving as an expert in this matter." Doc. 120-14. Plaintiffs also submit a

declaration from their counsel Matt Woods, explaining that this email "reflects the culmination of several communications between myself and [Dr. Tseng's lawyer] Ms. Wynn Decker regarding Dr. Tseng's status." Doc. 120 ¶ 16. Mr. Woods goes on to state that he was informed by Dr. Tseng's separate counsel that his reason for wanting to withdraw was "the continuing dispute over the peer review privilege," and the fact that the United States had indicated it would soon be filing a motion to compel. *Id.* According to Mr. Woods, counsel's one-sentence email "reflects Dr. Tseng's final answer" after Plaintiffs "ask[ed] Dr. Tseng to reconsider" his decision to withdraw "under all the circumstances, given his commitment to the Andersons." *Id.*

This threadbare story is not enough to support the extraordinary relief Plaintiffs seek, which has massive implications for the entire case. The United States respectfully submits the Court should require considerably more evidence than Plaintiffs have provided, and make a probing inquiry, before even entertaining their request to switch experts at this phase of the lawsuit. For example, the Court should consider probing:

- Plaintiffs' contractual relationship with Dr. Tseng – to understand the implications of his apparent decision to withdraw, and what rights or leverage Plaintiffs had or still have in this situation with respect to the expert on whose opinion they have relied for so long;

- All communications Plaintiffs' counsel had with Dr. Tseng between the time the United States shared the Legacy letter with them in April 2024 and the time Dr. Tseng's counsel notified them of his decision to withdraw in August 2024;

- All efforts by Plaintiffs to learn more about the apparent "dispute" between Dr. Tseng and Legacy Health;

- The nature and timing of Plaintiffs first becoming aware Dr. Tseng's withdrawal was a possibility;

- The nature and timing of Plaintiffs' interactions with potential new experts to replace Dr. Tseng, including the extent to which any such new expert is aware of the opinions or testimony of Dr. Friedman, or the testimony of the VA surgeon accused of malpractice, Dr. Archana Ramaswamy.

Knowing much more about these areas, and others like them, would seem most helpful in understanding the true reasons for Plaintiffs' delay. *See, e.g.*, *Enborg*, 2022 WL 1300569, at *4 (questioning reasons offered for requested substitution; "These explanations strike the Court as problematically vague, unsubstantiated and inconsistent"); *Fidelity Nat. Financial, Inc.*, 308 F.R.D. at 655 (denying substitution; "NU's counsel has provided no declaration establishing that these facts are true").

In sum, Plaintiffs have not yet shown a good reason for their delay, and this factor should therefore count against them.

### d. Plaintiffs have not filed their motion in good faith.

When the United States chose in April 2024 to share with Plaintiffs the concerning information it had received about Dr. Tseng, and made clear it was interested in learning more about the situation, Plaintiffs could have taken any number of approaches. They knew then that their expert was in serious trouble and, if not subject to outright disqualification, may not prove credible as a witness. They could have immediately notified the Court of

their predicament and sought leave to substitute in a new expert at that time. But they did not.

Plaintiffs also could have taken seriously their obligations under Rule 26 to timely supplement their expert disclosures, insisting that the expert they had hired and worked with for years provide critical information about his current professional credentials and standing. Yet, there is no evidence of any efforts by Plaintiffs to learn anything about Dr. Tseng's situation, to enforce their contract with him, or of any communications between Plaintiffs' counsel and counsel for Dr. Tseng or Legacy in the four months following the April 2024 disclosure. It is thus far from clear what, if anything, Plaintiffs have done since then to better understand the situation they find themselves in when it comes to Dr. Tseng.

Rather, Plaintiffs have simply told the United States, and now represent to this Court, that they "defer" to Dr. Tseng and Legacy as to privilege questions, and consider the Legacy letter to reflect a mere "private dispute regarding internal patient care," wholly "unrelated to the facts of this case." Doc. 119 at 1, 10. At the same time, while purporting to defer to others and insisting they have "no first-hand knowledge" about the challenges faced by Dr. Tseng, Doc. No. 127-1 at 1, Plaintiffs believed they knew enough to invoke peer-review privilege in response to the United States's discovery requests. Doc. No. 128-3 to 128-4, 128-7 (exhibits included with pending motion to compel).

The Legacy letter is no mere private dispute. In the context of this very *public* case, where Plaintiffs have squarely put Dr. Tseng forward to accuse a highly qualified federal-government surgeon of violating the standard of care, the Legacy letter is crucial evidence

of Dr. Tseng's professional skills and qualifications that supposedly entitle him to level such a charge.

While Dr. Tseng's thought process in deciding to produce the letter to the United States in the California case is unknown, he was actually correct to do so. Plaintiffs insist the United States's pending motions to compel (in this Court and in the District of Oregon) amount to an attempt to invade privilege, but as the authorities cited in those motions show, no such state-law privilege exists in federal court. Therefore, the letter and related documents and information are rightfully subject to discovery.

All this has put the United States in the difficult position of having to fight (so far unsuccessfully) on multiple fronts in order to learn the most basic information about the serious professional challenges faced by Plaintiffs' liability expert. Plaintiffs' May 13, 2024 letter sent shortly after the United States served its discovery on them disclaimed any obligation to know or learn about their own expert's apparent loss of privileges, and – without disclosing that he was represented by separate counsel – suggested the United States should subpoena Dr. Tseng. *See* Doc. 127-1 to 127-3, 128-6 (exhibits to pending motion to compel discovery).

In support of their current motion seeking to swap experts, Plaintiffs omit: (1) their May 13, 2024 letter; (2) their discovery responses invoking privilege (not included supposedly "due to size/length," Doc. 120 ¶ 10); and (3) the United States's July 12 letter to them (to which they never responded) asking them to justify under Rule 26 their "see no evil" posture concerning their own expert. *See* Doc. Nos. 127-1, 128-3, 128-4, and 128-6 (exhibits to pending motion to compel discovery). These omissions deflect attention from

Plaintiffs' own role and litigation choices in connection with the Legacy letter and the United States's so-far-unsuccessful attempts to learn more about the qualifications of Plaintiffs' expert. Plaintiffs thus present an incomplete narrative as the basis for this motion.

This is not the first time Plaintiffs have come before this Court seeking extraordinary relief on the basis of an incomplete narrative. The last time they belatedly sought to amend the case schedule – to allow for an amended complaint exceeding the sum certain sought in their administrative FTCA claim – the United States had to expend much time and effort in explaining the full story. *See* Doc. 70 at 14-15 (United States response to motion, summarizing key facts omitted by Plaintiffs). Plaintiffs eventually withdrew that motion, but it seems to reflect an unfortunate pattern.

Accordingly, Plaintiffs have not shown good faith in filing the current motion. This element should not weigh in their favor for excusable-neglect purposes.

### 2. Plaintiffs have not shown diligence, and thus cannot establish good cause.

Plaintiffs "argue that [they were] diligent because [their] expert only recently quit and that his reasons for doing so were outside of [their] control. However, this representation vastly oversimplifies the facts and procedural posture of this case." *Leibel*, 185 F.Supp.3d at 1356.

For reasons made clear in the Background section, as well as the discussions at sections III.B.1.b-d above, Plaintiffs failed to demonstrate diligence in this matter at many points. Their motion emphasizes their diligence following Dr. Tseng's apparent

communication of his final decision to withdraw on August 6, 2024. The United States does not question Plaintiffs' diligence since that time.

Rather, Plaintiffs repeatedly failed to take reasonable steps during the four months that followed the April 2024 disclosure, which could and would have ameliorated the current situation. For example, Plaintiffs could have immediately notified the Court that their expert was facing serious professional issues and may not be suitable to establish liability. They could have begun working immediately to locate a potential substitute expert. And they could have immediately proposed to the United States the concept of seeking a replacement expert, rather than waiting four months before doing so. Instead, Plaintiffs chose to gamble that the United States would give up its efforts to learn more about Dr. Tseng's predicament, hoping no admissible evidence about his current qualifications ever came to light and they could continue to rely on his opinion. This was both unwise and inconsistent with the extraordinary relief Plaintiffs now seek. *See, e.g.*, *Fagen*, 2016 WL 2885958, at *3; *Smith*, 2013 WL 247715, at *2; *Crandall*, 2012 WL 6086598, at *2.

To support their good-cause argument, Plaintiffs rely on *Vincent v. Omniflight Helicopters Inc.*, 2009 WL 4262578 (E.D. Wis. Nov. 24, 2009). *See* Doc. No. 119 at 11-12. This Court should not rely on *Vincent*, however, because it is unpersuasive. The expert there withdrew after his credibility was destroyed at a deposition, and the court allowed substitution without fully responding to the arguments raised by the non-moving party. For example, the defendants in *Vincent* argued that "plaintiff should not be permitted to 'try out' experts and if one fails to perform as hoped, simply replace him after the fact," and

that allowing a swap "would subvert the purpose of Rule 26 expert disclosures," as that rule "is intended to facilitate a fair contest with basic issues and facts disclosed to the fullest practical extent." *Id.* at *3 (citing defendant's brief). The court failed to address this important consideration, which applies equally here.

The *Vincent* defendants also pointed out that "allow[ing] replacement of experts under circumstances such as this . . . could result in a series of substitutions and vastly increase the expense of litigation," *id.*, another argument to which the court did not respond. *Cf. Sithon Maritime Co. v. Holiday Mansion*, 1998 WL 433931, *1 (D. Kan. July 30, 1998) (noting expert substitutions "could go on endlessly" if granted "without a showing of valid reason"). Finally, the defendants in *Vincent* argued allowing substitution "would defeat one of the purposes of discovery by encouraging defendants to 'hold back' on potentially damaging criticisms of an expert until trial," and that this would permit "trial by ambush, something the rules of discovery seek to prevent." 2009 WL 4262578, at *3 (citing defendants' brief). Once again, the court said nothing in response to this strong policy argument, which squarely applies in this case where the United States chose to share the Legacy letter rather than lying in wait for tactical advantage.

One additional note about *Vincent* is that the court, in allowing substitution, conditioned that step on "plaintiff reimburs[ing] defendants for the expenses incurred in preparing for and conducting the deposition of" the expert who was being replaced. *Id.* at 4 (citing *Sithon*, 1998 WL 433931, at *1). While relying heavily on *Vincent* and urging this Court to follow it, Plaintiffs have not offered to reimburse any of the expenses borne by the United States in deposing or otherwise responding to Dr. Tseng's opinions.

Accordingly, Plaintiffs have failed to show good cause, even assuming they were able to show excusable neglect (which they cannot).

**C. Alternatively, the Court should impose restrictions to reduce the inevitable prejudice to the United States.**

Should the Court decide to allow substitution, the United States respectfully requests that it do so only subject to strict limitations, in order to reduce somewhat the inevitable prejudice that would result. Specifically, in keeping with principles from Judge Frank's decision in *Cardiac Science, Inc. v. Koninklijke Philips Electronics N.V.*, 2006 WL 3836137 (D. Minn. Dec. 22, 2006), as well as other cases discussed in section III.B.1.a.iii above, the Court should impose some or all of the following conditions:

- Require the new expert to adopt Dr. Tseng's initial and rebuttal reports in their entirety, and recommend to Judge Bryan that the new expert's testimony at trial be limited to establishing the veracity and integrity of Dr. Tseng and the conclusions reached by Dr. Tseng;

- Not permit Plaintiffs to share with the new expert any information about the testimony in the case by Defendant's expert surgeon Dr. Jeffrey Friedman or VA surgeon Dr. Archana Ramaswamy, nor the rebuttal report or deposition testimony of Dr. Tseng (which referenced the same), before the new expert renders his or her initial report;

- Not permit the new expert to testify in any manner that is contrary to or inconsistent with Dr. Tseng, including his decision at the time of his

deposition not to retreat from his theory that the left gastric artery "must have" been cut on April 25, 2018;

- Recommend to Judge Bryan that the United States be allowed to use Dr. Tseng's deposition testimony for impeachment purposes at trial;

- Order Plaintiffs to reimburse the United States for the $35,250.00 it has paid to liability expert Dr. Jeffrey Friedman for his work on the case to date, and for other associated costs related to the defense of the liability aspect of the case to date in an amount to be proven;

- Allow the United States to depose the new expert for up to two days, at Plaintiffs' expense;

- Allow the United States sufficient time to identify its own new liability expert, and for that expert (or Dr. Friedman, at the option of the United States) to prepare a responsive report.

Should the Court allow Plaintiffs to disclose a substitute expert at this phase of the case, the inevitable prejudice to the United States would be substantial and, in the end, difficult if not impossible to quantify. While the listed measures could never eliminate such prejudice, courts facing analogous circumstances have employed them in their efforts to reduce it.

## IV.    CONCLUSION

Plaintiffs have not demonstrated either excusable neglect or the good cause required to allow a party to disclose a new expert long after the Court-ordered deadline for doing so.   Accordingly, their motion should be denied.

Respectfully submitted,

Dated:  August 30, 2024

ANDREW M. LUGER
United States Attorney

*s/ David W. Fuller*

BY:  DAVID W. FULLER
Assistant U.S. Attorney
Attorney ID Number 390922
600 United States Courthouse
300 South Fourth Street
Minneapolis, MN 55415
Phone:  612-664-5600
Email: David.Fuller@usdoj.gov

Attorneys for the
United States of America

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 21-cv-02088-JMB-LIB

| | |
|---|---|
| CARL ANDERSON and<br>TAMMY ANDERSON<br><br>          Plaintiffs,<br><br>   v.<br><br>THE UNITED STATES OF<br>AMERICA,<br><br>          Defendant. | **CERTIFICATE OF COMPLIANCE** |

The undersigned attorney for Defendant certifies this memorandum complies with the type-volume limitation of D. Minn. LR 7.1(f) and the type size limitation of D. Minn. LR 7.1(h). The memorandum in support of motion to dismiss has a total of 8,569 words of type, font size 13. The memorandum was prepared using Microsoft Office 365, which includes all text, including headings, footnotes and quotations in the word count.

SIGNATURE PAGE TO FOLLOW

Dated: August 30, 2024

ANDREW LUGER
United States Attorney

*s/ David W. Fuller*

_____
BY:  DAVID W. FULLER
Assistant U.S. Attorney
Attorney ID Number 390922
ERIN M. SECORD
Assistant U.S. Attorney
Attorney ID Number 0391789
FRIEDRICH A. P. SIEKERT
Assistant U.S. Attorney
Attorney ID Number 142013
600 U.S. Courthouse
300 South 4th Street
Minneapolis, MN  55415
Phone: 612-664-5600

**Attorneys for Defendant
United States of America**